[Crim. No. 22328. May 27, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
ALONZO LEE TAYLOR, Defendant and Appellant.

■■■■■■■■■

■■■■■■■■■■■■

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Kelvin D. Filer, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Defendant appeals from a judgment after a jury found him guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision 1, and found true the allegation that defendant had personally used a deadly weapon in violation of Penal Code section 12022, subdivision (b).

The sole question presented by this appeal is whether defendant was denied a fair trial by the court's refusal to allow defendant to wear civilian clothes because they had not been previously submitted in accordance with a local jail rule. We agree with defendant's contention that the refusal to allow him to wear civilian clothing at trial violated his rights to due process and equal protection.

When the case came to trial, defendant was in custody.[1] During selection of the jury, defendant was dressed in street clothes. Inexplicably, the next day defendant was brought to the courthouse in jail clothing. It appears that before defendant was seen by the jury, a conference occurred in the judge's chambers. Defendant's attorney represented that he had civilian clothes in his office and requested that the defendant be allowed to wear them at trial. The judge denied the request based on a local administrative rule requiring that the clothes be submitted through the jail, and not in the courtroom. Defendant's attorney claimed to be unaware of the rule. Despite an offer to allow the bailiff

---

[1]Counsel represented that defendant was unable to post bail because of his financial situation. Defendant was originally released on bail of $25,000. During one of the preliminary motions, he was present in court initially but later disappeared without notifying the court or his counsel. The court issued a bench warrant. The defendant was subsequently brought into court on the bench warrant and bail was reset at $50,000. It appears that defendant was unable to post that amount and remained in custody throughout the remainder of the proceedings.

■■■■■■■

to search the clothes, the judge refused to allow a short delay for the defendant to change clothes. The trial proceeded with defendant dressed in identifiable jail clothes. On the second of two days of testimony, the defense attorney's clerk attempted to deliver the clothes to the jail, but arrived ten minutes after the appointed time for accepting clothing. Again the judge denied the request to allow defendant to change clothes.

Defendant was accused of the stabbing death of Tony Horrice (Motto). Early in the morning on September 24, 1979, defendant Taylor, Robert Blanco, Alan Cox, William Scott, and the victim met at Scott's residence. The testimony concerning the homicide is in conflict because Blanco, the chief prosecution witness, and defendant implicate each other. Both agree that an argument occurred in the kitchen, and that Motto reached as if to draw a gun he carried in his waistband. Blanco testified that defendant stabbed Motto with a knife that was lying on the drainboard. Defendant testified, however, that he only grabbed the victim's wrists to prevent him from drawing the gun, and that Blanco reached over defendant's shoulder and stabbed Motto.

Because this case involves an assessment of the prejudicial effect of defendant's appearance in jail garb, we review the evidence in greater detail. Blanco, the primary witness against defendant, testified that the argument broke out in the kitchen between defendant and Motto over the gun that Motto had in his waistband. Defendant claimed that the gun was his. He asked for the gun, and Motto refused. Blanco said to Motto, "Just give him a gun, man," to which Motto threatened, "I give you yours too," and started to reach in his waistband. Blanco testified that at that point he said, "Motto, no" and started to walk out of the kitchen. Blanco further testified as follows: Out of the corner of his eye, Blanco saw the defendant rush the victim with a knife in his hand. Motto retreated, blocking the knife with his arm. Defendant stabbed Motto in the chest, and Blanco grabbed defendant's wrist, forcing him to drop the knife. At that point, defendant wrestled Motto into the living room, pinned Motto to the floor, and took the gun. Motto got up with blood on his chest, walked to the door, turned and pointed in the direction of Blanco and said, "Man, you did me wrong." Blanco responded, "If I did anything, I tried to save your life." Motto ran out the door and down a few houses, where he collapsed and died in his aunt's yard. At that point, Blanco and the defendant got into Blanco's car and drove to a restaurant. Defendant allegedly said to Blanco in the car: "Why did you stop me? I was going to try to stab him in the heart."

Alan Cox testified that he and the others went to Scott's house that night to get high on PCP-laced cigarettes, but that the victim refused the offer of PCP from defendant. According to Cox, defendant reached and grabbed Motto and slammed him up against the stove, but defendant's hands were empty. Cox did not see defendant stab Motto.

Defendant testified that Blanco used PCP that night, and was joined by Motto and Cox, but that he had none. According to defendant, the argument in the kitchen about the gun was between Blanco and Motto. Motto allegedly threatened Blanco saying, "Well, you're going to get yours," and reached toward his waistband. At that point, defendant rushed Motto and grabbed both wrists. Defendant warned Motto that he was not going to pull a gun because his fiance and kids were in the house. Defendant testified that Blanco's hand came over his right shoulder and he thought Blanco was hitting Motto. Defendant pulled a knife from Motto's chest and threw it on the floor. Motto went to the kitchen door and reached in his waistband again, and defendant pushed him into the living room. They wrestled to the floor and defendant choked Motto until he let go of the gun. Motto got up, went to the front door, turned, pointed and looked toward Blanco and said, "Man, why did you do me wrong?" Defendant denied later telling Blanco that he tried to kill Motto.

Dr. Carpenter, who performed the autopsy, testified that the victim had three stab wounds to the left arm near the elbow, a cut on the back of the left thumb, and a fatal stab wound to the front part of the left chest. The nonfatal wounds were consistent with someone trying to protect himself. The parties stipulated that an expert in the examination of blood, employed by the county coroner's office, would have testified that the victim's blood had PCP in it.

The jury found defendant guilty of voluntary manslaughter, in violation of Penal Code section 192, subdivision 1, a lesser included offense of the charged crime of murder (Pen. Code, § 187).

■ For the reasons set forth below, we conclude that the refusal to allow defendant to wear civilian clothing at trial constituted a violation of due process and equal protection; that defendant timely objected to the jail clothing; that under the circumstances of this case, the trial court erred in requiring strict adherence to the local jail practice; and that the error was prejudicial requiring reversal of the judgment.

We begin with the bedrock proposition that "[t]he right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment...." (*Estelle v. Williams* (1976) 425 U.S. 501, 503 [48 L.Ed.2d 126, 130, 96 S.Ct. 1691].) *Estelle* held that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, ..." (425 U.S. at p. 512 [48 L.Ed.2d at p. 135].) In that case, however, the court found the failure to object to being tried in such clothes "sufficient to negate the presence of compulsion necessary to establish a constitutional violation." (425 U.S. at p. 513 [48 L.Ed.2d at p. 135].)

■   There are substantial reasons for the rule that a criminal defendant is entitled to be tried in ordinary clothing. Foremost is the rationale that compelling a defendant to go to trial in jail clothing could impair the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt. (*Estelle v. Williams, supra*, 425 U.S. at p. 504 [48 L.Ed.2d at p. 130]; *Gaito v. Brierley* (3d Cir. 1973) 485 F.2d 86, 88-89 [26 A.L.R.Fed. 529]; *Hernandez v. Beto* (5th Cir. 1971) 443 F.2d 634, 636-637.) To implement and protect the presumption of innocence, "courts must be alert to factors that may undermine the fairness of the factfinding process." (*Estelle, supra*, 425 U.S. at p. 503 [48 L.Ed.2d at p. 130].) The Supreme Court has observed that the defendant's jail clothing is a constant reminder to the jury that the defendant is in custody, and tends to undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor. (425 U.S. at pp. 504-505 [48 L.Ed.2d at pp. 130-131].) The clothing inexorably leads to speculation about the reason for defendant's custody status, which distracts the jury from attention to permissible factors relating to guilt. In most instances, parading the defendant before the jury in prison garb only serves to brand the defendant as someone less worthy of respect and credibility than others in the courtroom. "The prejudice may only be subtle and jurors may not even be conscious of its deadly impact, but in a system in which every person is presumed innocent until proved guilty beyond a reasonable doubt, the Due Process Clause forbids toleration of the risk. Jurors required by the presumption of innocence to accept the accused as a peer, an individual like themselves who is innocent until proved guilty, may well see in an accused garbed in prison attire an obviously guilty person to be recommitted by them to the place where his clothes clearly show he belongs." (*Estelle v. Williams, supra*, 425 U.S. at pp. 518-519 [48 L.Ed.2d at p. 139] (dis. opn. of Brennan, J.).)

Another reason for disfavoring the use of prison clothes during trial was articulated in *People* v. *Zapata* (1963) 220 Cal.App.2d 903, 911 [34 Cal.Rptr. 171]. That court recognized that beside the potential prejudice raised in the minds of the jurors, the defendant may be handicapped in presenting his defense by the embarrassment associated with his wearing jail garb.

The incompatibility of the defendant's jail clothing and the presumption of innocence was aptly stated by the Colorado Supreme Court more than 35 years ago: "[t]he presumption of innocence requires the garb of innocence, and regardless of the ultimate outcome, or of the evidence awaiting presentation, every defendant is entitled to be brought before the court with the appearance, dignity, and self respect of a free and innocent man [or woman], except as the necessary safety and decorum of the court may otherwise require." (*Eaddy* v. *People* (1946) 115 Colo. 488, 492 [174 P.2d 717].)

Apart from the violation of due process inherent in requiring a defendant to attend trial attired in jail clothing, the practice also impinges on the tenets of equal protection. The Supreme Court has noted that the practice "operates usually against only those who cannot post bail prior to trial. Persons who can secure release are not subjected to this condition. To impose the condition on one category of defendants, over objection, would be repugnant to the concept of equal justice embodied in the Fourteenth Amendment. *Griffin* v. *Illinois*, 351 U.S. 12 (1956)." (*Estelle* v. *Williams, supra*, 425 U.S. at pp. 505-506 [48 L.Ed.2d at p. 131].) In the words of the *Zapata* court: "A defendant who can afford bail appears for trial in the best array he can muster. He may be a veritable satyr clad like Hyperion himself. Imposition of jail clothing on a defendant who cannot afford bail subjects him to inferior treatment. He suffers a disadvantage as a result of his poverty. Our traditions do not brook such disadvantage." (220 Cal.App.2d at p. 911.)

█  Although the right to be tried in civilian clothing is a constitutional right valuable to a fair trial, the right may be waived by a failure to timely object or otherwise bring the matter to the court's attention. (*Estelle, supra*, 425 U.S. at pp. 508, 512-513 [48 L.Ed.2d at pp. 133, 135]; *People* v. *Hernandez* (1979) 100 Cal.App.3d 637, 646 [160 Cal.Rptr. 607]; *People* v. *Hetrick* (1981) 125 Cal.App.3d 849, 853-854 [178 Cal.Rptr. 303]; see also *People* v. *Dubose* (1970) 10 Cal.App.3d 544 [89 Cal.Rptr. 134].) There are two reasons for this limitation. First, the potential harm is of a type that may be avoided if the matter

is brought to the court's attention. A timely objection allows the court to remedy the situation before any prejudice accrues. (*Estelle, supra*, 425 U.S. at p. 508, fn. 3 [48 L.Ed.2d at p. 133].) In addition, there may be instances where for tactical reasons the defendant may wish to be tried in jail garb. (*Id.*, at p. 508 [48 L.Ed.2d at p. 133]; *Garcia v. Beto* (5th Cir. 1971) 452 F.2d 655.) Recognizing that the defendant is entitled to be tried in ordinary clothing, an attorney may nevertheless decide, based on the peculiar circumstances of an individual case, not to exercise that right. In such a rare case, courts should be reluctant to interfere with that decision because an attorney may waive his client's rights as to matters involving trial tactics. (*People v. Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].)

■ The Attorney General argues that the trial court, relying on the jail rule, properly denied the request of defendant to change clothes, and that the rule itself is reasonable and lawful for security purposes. In effect, the argument is that defendant's failure to find out what the procedure was and to follow it constituted a "waiver" of his right to wear civilian clothes. However, this "waiver" is different from the kind that occurs by a failure to object to the jail garb. Defendant clearly attempted to exercise his right to be tried in civilian clothing by objecting on two occasions. He would have been successful in his request but for his attorney's excusable failure to comply with the rule and the court's insistence on strictly applying it. In the abstract, we have no criticism of such a rule, recognizing that it may serve a legitimate governmental interest. However, when a local procedural rule is invoked to prevent the defendant from exercising his right to a fair trial, and alternatives are readily available, inflexible adherence to the rule cannot be tolerated.[2] Under these circumstances, the trial judge should take all reasonable measures to assure that a defendant who so desires may stand trial in civilian clothes.

Defendant's attorney indicated that he had the clothes available and offered to have the bailiff search them before giving them to defendant. The only asserted governmental interest in support of the rule—security—was obviated by this offer. Granting the request would have

[2]Where a particular practice operates so as to adversely impact on fundamental rights, strict judicial scrutiny is required. (*Estelle, supra*, 425 U.S. at p. 504 [48 L.Ed.2d at p. 130].) In the instant case, the existence of the rule is not disputed by the parties, thus the rule is not a part of the record. Because we conclude that the trial judge was not bound to require strict compliance with the rule, we need not decide whether the rule in this case serves a legitimate governmental interest and whether it is tailored so as to implement that interest without impinging on the rights of defendants to a fair trial.

resulted in only a short delay. (See *People* v. *Wilson* (1979) 97 Cal. App.3d 547, 550 [158 Cal.Rptr. 811]) (the trial of defendant trailed to allow proper clothing for the defendant).) The trial judge was not bound by the sheriff's rule and clearly had the authority and discretion to grant the request despite noncompliance with the rule. In view of the importance of the right and counsel's unambiguous objection, unwavering adherence to the rule constituted an abuse of discretion.[3]

There can be no waiver of a constitutional right absent "an intentional relinquishment or abandonment of a known right or privilege." (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019].) Under the facts of this case, it is clear that the defendant did not intentionally relinquish a known right. At the time of the first request, the defendant's attorney represented that he had no prior knowledge of the jail rule. Yet, exercise of the right to wear civilian clothes required knowledge of the local rule. Since at the time of the

---

[3]The remarks of the trial judge at the requests to wear civilian clothing do not reflect a deliberative consideration of the requests, but rather show an insistence on steadfast compliance with the rule. At the first request to wear civilian clothing, the following colloquy occurred:

"DEFENDANT'S ATTORNEY: I can hand him the clothes and he can change in the jail. The defendant has a right to wear civilian clothes.

"THE COURT: Really?

"DEFENDANT'S ATTORNEY: Would you like the case law?

"THE COURT: Sure.

"DEFENDANT'S ATTORNEY: I'll get it.

"THE COURT: At any rate, your motion is denied. You know the rules. The clothing is supposed to be submitted to the jail, not in the courtroom.

"DEFENDANT'S ATTORNEY: It's a new rule to me.

"THE COURT: It has to be submitted to the jail and not in the courtroom, and we are now in the courtroom. We are ready to proceed. Everybody's here. We're not going to take time for him to change clothes . . . ."

On the second day of testimony, the defense attorney's clerk arrived with the clothes at the jail ten minutes late. Again, the judge denied the request to change clothes.

"THE COURT: But, Mr. Menaster, it is the responsibility of your office to find out when the jail accepts clothes and get them there. And if your clerk is ten minutes late, that is your clerk's fault . . . . But, again, there is a jail rule that if you want to have clothes for your man, it is your responsibility to get the clothes to the jail. I don't know what time the jail says you can get clothes there . . . ."

Perhaps the most revealing remarks were made by the trial judge in denying defendant's motion for a new trial: "[I] personally feel—I am aware of some of the rulings of the appellate court on this issue, and I really think they are rather silly. It has been my experience in practicing criminal law for about 25 years that jurys feel more sympathy for a person who is in custody than they do one who is not in custody. I think it works exactly the opposite.

"If I tried a man on bail, I would want him to look as pitiful as possible. I wouldn't want him to walk in here in a three-piece suit. I would rather he walk in here in some washed-out jail blues, so folks would feel a little sorry for him. Everybody has their own system."

first objection the attorney was unaware of the rule, the failure to comply with it was clearly not an intentional relinquishment of a known right, thus there was no waiver.

On the second day of trial defendant's attorney attempted to comply with the rule, but his clerk arrived at the jail ten minutes late. The judge again denied the request to allow defendant to change. Even viewing this mistake by counsel at its possible worst, we cannot say that a waiver occurred. In any event, since a timely objection is required, granting the request on the second day of trial would have been of questionable value to defendant because his earlier request had been denied and the jury had already seen him in jail clothes.

The cases relied on by the Attorney General are readily distinguishable. In *People* v. *Dubose, supra*, 10 Cal.App.3d 544, the defendant did not mention the jail garb until after the trial had begun. Moreover, the opinion indicates that there was no actual request to change clothes, but that the matter was merely mentioned in chambers. The Attorney General argues that in this case, the jury had presumably seen the defendant in his jail clothes before the request was made. This contention is not supported by the record. The remarks of the trial judge at the defendant's first request are ambiguous: "Everybody knows he's in custody. It's already been pointed out that he's in custody. The charge is murder. I think most people would assume he would be in custody, and I don't see where it makes any difference." However, there is nothing in the record indicating the jury was aware that the defendant was in custody. Moreover, at that first request, defendant's attorney clearly stated that "the defendant yesterday had street clothes on."

In *People* v. *Hernandez, supra*, 100 Cal.App.3d 637, also relied on by the Attorney General, the defendant failed to object to his being tried in jail clothes. In *People* v. *Wilson, supra*, 97 Cal.App.3d 547, there was no showing in the record that defendant was in the presence of the jury while dressed in jail attire. In *People* v. *Garcia* (1954) 124 Cal. App.2d 822 [269 P.2d 673], the jury panel was in the courtroom when defendant's case was called. Defendant was dressed in a blue denim shirt and trousers, with "County Jail" marked on each. Counsel's request to discharge the entire panel was denied; however, the court ordered that the defendant thereafter be dressed in ordinary clothes. The Court of Appeal held that no showing was made that a fair and impartial trial could not be had with the jurors called. In reaching that conclusion, the court listed the following factors: no earlier request was

made, the jurors were subsequently examined by counsel, and the record did not reflect which jurors, if any, noticed the writing on the clothing or were challenged for that reason, or that defendant exhausted his peremptory challenges. The court noted that at that time, no cases held that if the jury is informed that the defendant is in custody, it would be prejudicial to order him to trial under those conditions. (*Id.*, 124 Cal.App.2d at pp. 824-825.)

Having decided that the right to be tried in civilian clothing is a constitutional right valuable to insuring a fair trial, that it may be waived by a knowing failure to object, and that there was no waiver in this case, we next determine the standard applicable for gauging whether the error was so prejudicial as to require reversal of the conviction.

The traditional test of harmless error is whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) As we have stated, the error in this case is of federal constitutional magnitude. (*Estelle v. Williams, supra*, 425 U.S. 501; *People v. Hetrick, supra*, 125 Cal.App.3d 849.) ■ Some constitutional rights are deemed so basic to a fair trial that their violation requires automatic reversal. (See, e.g., *Payne v. Arkansas* (1958) 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844] [coerced confession]; *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733] [right to counsel]; *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243] [impartial judge].) However, not all constitutional errors amounting to a violation of due process necessitate reversal per se. (*People v. Bostick* (1965) 62 Cal.2d 820, 824 [44 Cal.Rptr. 649, 402 P.2d 529]; see also *People v. McCullough* (1979) 100 Cal.App.3d 169, 183 [160 Cal.Rptr. 831].) Where federal constitutional error is involved, the test to be applied is that laid down by the Supreme Court in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) *Chapman* requires that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].) This test has been previously applied to error involving the use of prison garb at trial. (*People v. Hetrick, supra*, 125 Cal.App.3d 849, 855.) ■ Applying the *Chapman* test, it is our task to examine the entire record and "if . . . it appears reasonably possible that the error might have materially influ-

enced the jury in arriving at its verdict," the judgment must be reversed. (*People* v. *Coffey* (1967) 67 Cal.2d 204, 219-220 [60 Cal.Rptr. 457, 430 P.2d 15].) Based on our review of the entire record, we cannot say that the error in this case was harmless beyond a reasonable doubt. Although the impact of the error on the minds of the jurors is difficult to assess, certain factors indicate that the error was not harmless. Beside the constant reminder of the defendant's jail clothing itself, the fact of defendant's in-custody status was highlighted by the in-court identifications of defendant by two prosecution witnesses. Blanco identified defendant as "wearing blue county clothes." Witness Cox said that defendant was the one wearing a "blue jail suit."

The highly contested facts of the underlying homicide demonstrate that the jury was squarely confronted with the problem of credibility of witnesses. The main prosecution witness (Blanco) testified that the defendant stabbed the victim. At trial, defendant's counsel elicited the inconsistency that Blanco testified that he did not see the defendant pick up the knife, yet he had told the police that defendant picked up the knife from the drainboard.

Witness Cox testified that he saw defendant grab the victim and slam him against the stove, but that the defendant did not have a knife in his hands.

Defendant testified that he grabbed the victim to prevent him from pulling the gun from his waistband, and that as defendant was holding him, Blanco reached over defendant's right shoulder and stabbed the victim. This version is not inconsistent with the testimony of Cox. Moreover, the defendant's version is not inconsistent with the testimony of the medical examiner relating to the nature of the stab wounds. The victim's defensive wounds could have occurred as the defendant was holding his wrists. Conceivably, the victim could have seen that he was being stabbed, and raised his arms in defense, even while the defendant held his wrists. If no one was holding the victim's arms during the attack, he might have drawn the gun from his waistband.

Witness Blanco was further implicated by what all agree to be the last words of the victim, when he turned, pointed toward the direction of Blanco, and said, "Man, you did me wrong."

There is an indication that the jury considered defendant's version of the facts but ultimately rejected it. During deliberations, the jury sent a

note to the judge requesting whether it was possible to find out if Blanco was right or left-handed. As there had been no evidence on this point, the judge properly answered in the negative. However, the question strongly suggests that the jury considered defendant's testimony that Blanco reached over his right shoulder to stab the victim. We cannot say that in rejecting defendants's version of the facts, that the jury was not influenced by the constant reminder of defendant's in-custody status. The jury essentially had to decide between two conflicting versions of the facts based on the credibility of two witnesses, either of whom could have committed the homicide. In such a situation, where one of the witnesses, the defendant, was clad in jail clothing during his testimony and throughout the trial, we cannot say that the subliminal impact on the jury was so insignificant that the error was harmless beyond a reasonable doubt.

Finally, we reject the Attorney General's suggestion that the error was harmless because "the jury was instructed to the effect that [defendant's] jail status was not to affect their decision." In support of this assertion, the Attorney General notes that the jury was instructed according to CALJIC No. 1.00 (4th ed. 1979).[4] Although this instruction informs the jury not to be influenced by the fact of defendant's arrest or because he was charged with a crime or brought to trial, there is no mention of the defendant's jail status nor his jail clothing. Thus, the instruction did not dispel the prejudice.

In conclusion, we hold that denial of the right to be tried in civilian clothing is a violation of the due process and equal protection clauses of the 14th Amendment, and that this right may be waived only expressly or by failure to make a timely objection to the defendant's jail clothing. Moreover, the defendant did timely object in this case, and the trial court erred in requiring strict adherence to a local practice requiring that civilian clothes be first submitted to the jail. Because the error was of federal constitutional dimension, the test on review is that articulated

---

[4]In relevant part, CALJIC No. 1.00 states: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial. None of these circumstances is evidence of his guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent.

"You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

by the Supreme Court in *Chapman v. California, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. Based on our independent review of the entire record, we cannot state that it is our belief that the error was harmless beyond a reasonable doubt.

The judgment is reversed and the cause is remanded to the trial court for further proceedings in conformity with the views herein expressed.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., Kaus, J., and Reynoso, J., concurred.